IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

DAVID WALTON,

      Appellant,

 v.

                             Case No. 5D22-794
                             LT Case No. 2021-01

LAKE-SUMTER STATE COLLEGE,

      Appellee.

_____/

Opinion filed April 14, 2023

Administrative Appeal from the
Lake-Sumter State College.

Tobe M. Lev, of Lev & Siwica, P.A.,
Orlando, for Appellant.

Brian Koji, of Allen, Norton & Blue, P.A.,
Tampa, for Appellee.


MAKAR, J.

     David Walton, Ph. D., was hired by Lake-Sumter State College as an

anthropology instructor in August 2015 and, after five years of service,

became eligible for, and was awarded, a continuing contract on July 31,

1

2020. The continuing contract, which is a form of academic tenure, stated that Dr. Walton's employment would remain in force from year to year "unless terminated by mutual consent in writing by the parties hereto or unless [Dr. Walton] is suspended or removed *for cause* pursuant to law and rules of the State Board of Education and the Board." (Emphasis added). Less than a year later, on June 3, 2021, Dr. Walton was informed via letter from the College's president that his continuing contract would terminate at month's end and not be renewed. Dr. Walton elected to contest his termination in an administrative hearing, which resulted in a recommended order upholding the College's action that the College's board affirmed. Dr. Walton now appeals.

Dr. Walton raises several issues on appeal, which we distill into two distinct ones. The first is whether Dr. Walton's termination was proper based on the College's determination that his workload, which included anthropology courses and student success courses, was unsatisfactory and thereby sufficient cause to end his contract. The second is whether the College's determination that demand for anthropology courses had declined to the point that eliminating them entirely, and thereby also terminating Dr. Walton's employment, was sufficient cause under the continuing contract.

2

The applicable Florida administrative rule, entitled "Employment Contracts for Full-Time Faculty," states:

> Each district board of trustees may, upon recommendation of the president, terminate a full-time faculty employee under continuing contract, or return the employee to an annual contract, for failure to meet post-award performance criteria, or, for cause in accordance with college policies and procedures upon recommendation by the president and approval by the board.

Fla. Admin. Code R. 6A-14.0411(7)(a). The administrative rule specifies two paths to employee termination: (1) a faculty member's failure to meet post-award performance criteria, or (2) for cause in accordance with college policies and procedures. The College's written policy is consistent with the administrative rule; Dr. Walton's continuing contract is likewise consistent, and also includes resignation and "discontinuance" of Dr. Walton's position as grounds for termination.

To begin, Dr. Walton argues, in part, that his dismissal was improper because he did not fail to meet any post-award performance criteria by which faculty are to be periodically reviewed. The purpose of the criteria is to "contribute to the continual growth and development of faculty," such that each district board of trustees "shall adopt policy requiring periodic post-award performance reviews for faculty under continuing contract" using the same criteria for granting a continuing contract. *Id.* R. 6A-14.0411(6). A poorly performing faculty member who falls short of meeting established

3

post-award criteria can be let go without a finding that his termination was "for cause." It is an independent basis for terminating a faculty member under a continuing contract.

It is conceded that Dr. Walton performed commendably in his academic life, including his teaching of the many courses that he was assigned; his classroom performance and willingness to take on a heavy workload were recognized as admirable. The College claims that Dr. Walton's termination is justified because he failed to teach enough anthropology classes. Yet no post-award criteria had been established by which the College could penalize Dr. Walton for teaching an insufficient number of anthropology courses and too many student success courses, the latter typically being relegated for economic reasons to adjunct or part-time professors, rather than full-time professors. That the College had unilateral but unadopted and undisclosed expectations that a full-time professor must teach a certain percentage or number of courses within his discipline rather than student success courses does not matter; those expectations must be formally established as criteria pursuant to the administrative rule and the College's policy, and then made known to professors to be actionable, which was not done as to Dr. Walton. As such, to the extent that Dr. Walton's termination was based on the College's view that his anthropology workload

4

did not meet its unilateral, unadopted, and unwritten expectations, that conclusion was erroneous as a basis to terminate him, whether "for cause" or otherwise. Indeed, Dr. Walton could not be terminated "for cause" due to inadequate anthropology courses; doing so would make the "failure to meet post-award performance criteria" portion of the administrative rule superfluous. *See Holmes v. Fla. A & M Univ. by & Through Bd. of Trs.*, 260 So. 3d 400, 406 (Fla. 1st DCA 2018).

That said, a faculty member, even if stellar in his performance, can be terminated under a continuing contract in Florida where a justifiable determination is made that the adverse employment action is "for cause in accordance with college policies and procedures." The question presented in this case is whether the evidentiary record supports the College's determination that discontinuing anthropology as an academic discipline made available to its students was justified, thereby providing sufficient legal cause for terminating its only anthropology professor, Dr. Walton.

As an initial matter, the meaning of the phrase "for cause" in the continuing contract is a subject of substantial debate, justifiably so. It is not defined in the contract, nor is it defined in any applicable administrative rule, statute, or policy. According to the foremost legal dictionary, "for cause" is defined as "[f]or a legal reason or ground. The phrase expresses a common

5

standard governing the removal of a civil servant or an employee under contract." *For Cause*, *Black's Law Dictionary* 673 (8th ed. 2004); *see, e.g.*, *In re Piazza*, 719 F.3d 1253, 1261 (11th Cir. 2013).[1] Dictionary definitions provide some guidance, but not much.

Likewise, caselaw is sparse as to the definitional breadth of "for cause" terminations in the education realm. In Florida, the general notion of "good cause"—a close cousin of "cause"—is that its lack of a definition gives educational institutions a degree of leeway to determine what is a sufficient basis for termination. For example, in *Spurlin v. School Board of Sarasota County*, 520 So. 2d 294, 296 (Fla. 2d DCA 1988), the deputy school superintendent argued that "good cause" for termination was limited to the "seven-deadly sins" set out in the statute then applicable to teachers (i.e., immorality, misconduct in office, incompetency, gross insubordination, willful neglect of duty, drunkenness, and conviction of a crime involving moral turpitude).

---

[1] The Eleventh Circuit in *Piazza* quotes *Black's Law Dictionary* but adds that the understanding of "cause" "is not limited to legal dictionaries. Non-legal sources from 1978 to the present have consistently defined 'cause' as '[g]ood or sufficient reason,' as '[g]ood, proper, or adequate ground of action,' or as 'reasonable grounds for doing . . . something.'" 719 F.3d at 1261 (dictionary citations omitted).

The Second District rejected this narrow view, concluding the "good cause" standard that applied to the deputy school superintendent went beyond the seven offenses because the phrase "good cause" was undefined. The court stated that as "amorphous and unbounded as the words 'good cause' may seem when not specifically elaborated upon by the legislature, we are unwilling to ascribe to the expression a limitation which forecloses a school board from exercising its ability to decline a recommendation for a *lawful, rational, non-arbitrary, non-statutory reason*." *Id.* at 296 (emphasis added). It also noted the existence of "significant considerations, both practical and literal, for not binding a school board to a definition of 'good cause'" in an overly cramped way. *Id.*; *see also Dietz v. Lee Cnty. Sch. Bd.*, 647 So. 2d 217, 218 (Fla. 2d DCA 1994) (Blue, J., specially concurring) (noting that "by failing to further define just cause, the legislature gave school boards broad discretion to determine when a teacher may be dismissed during the contract term"). A synthesis of the admittedly limited caselaw supports the view that a termination "for cause" under a continuing contract is permissible if an educational institution proves a lawful, rational, non-arbitrary reason for doing so and no other impediment, such as a lack of due process, stands in the way. *See generally* Gwen Seaquist & Eileen Kelly, *Faculty Dismissal Because of Enrollment Declines*, 28 J.L. &

Educ. 193, 207 (1999) ("For tenured, public faculty . . . the courts have affirmed downsizing in those instances where the faculty received notice and a hearing and the institution could demonstrate the need for the cuts. Only in the cases of violations of an institution's internal procedures have faculty successfully challenged their dismissal.").

On this basis, we conclude that the College has the legal authority to discontinue a discipline due to a documented lack of student interest and enrollment. As a general matter, a college or university—like other educational institutions serving their communities—has the discretion, within legislative and institutional parameters, to define the scope of its course offerings. The College, believing that anthropology would generate student interest, hired Dr. Walton and marketed the discipline, hoping for sufficient enrollment in the various courses he offered; it even awarded him a continuing contract. When those efforts at establishing a beachhead for anthropology courses were unsuccessful, nothing legally stood in the College's way from reassessing the ongoing viability of the discipline and ultimately making the difficult decision to end the endeavor, particularly in the face of declining overall enrollments. Discontinuation of anthropology was a lawful and rational option.

We note that the administrative rule also allows for the termination of a full-time faculty member under continuing contract upon "consolidation, reduction, or elimination of an institution's program." Fla. Admin. Code R. 6A-14.0411(7)(b). The parties agree, however, that anthropology is not a program; instead, it is a "discipline" within the general education program. If an institution can terminate a full-time faculty member under a continuing contract for elimination of a program, it implicitly has the right to do so when only a discipline is eliminated.

Next, an inevitable result when a discipline is discontinued is that a college or university must decide how it will handle the employment of affected faculty and staff, perhaps by reassigning them to other disciplines, if feasible, or by terminating them. The authority for doing the latter is grounded in the principle that "for cause" terminations include those necessarily resulting from the legally justified discontinuation of a discipline.

Dr. Walton claims that his termination was improper because the College president's termination letter preceded the Board's final action and that the "discontinuance" of his professorship required more procedural protections, but he failed to make these arguments prior to this appeal, relying now on evidence not previously presented in the administrative proceeding. To be consistent with the administrative rule, the College

9

president should have recommended Dr. Walton's dismissal, rather than phrasing the letter as a termination, under the "for cause" standard. Fla. Admin. Code R. 6A-14.0411(7)(a) ("Each district board of trustees may, upon recommendation of the president, terminate a full-time faculty employee under continuing contract . . . ."). Even so, the purported oversight is harmless because Dr. Walton received an administrative hearing with full due process that protected his vested contractual rights. Moreover, the College sought to discontinue anthropology as a discipline; it did not seek to discontinue Dr. Walton's specific position while retaining anthropology. Had it sought only the latter, the contractual provision upon which Dr. Walton relies, but did not raise below, might have been implicated.

The remaining factual question is whether the College adequately documented its decision in the evidentiary proceedings in this case, such that its determination to terminate Dr. Walton was based on sufficient cause to discontinue anthropology as a discipline, which requires competent substantial evidence.

As background, the College, which has about 67-70 full-time faculty members, provides educational services in Lake and Sumter Counties at three campuses (Leesburg, Clermont, and Sumterville). Like many educational institutions, the College had experienced significant declining

10

enrollment since the peak in the 2019-2020 term. As for anthropology, although efforts were made to increase student awareness of and enrollment in various course offerings, the number of students enrolled was minimal. For example, during the 2019 Fall Semester, when overall student enrollment topped 5,000 college-wide, the number of students interested in anthropology justified only two courses. Dr. Walton taught both courses as well as student success courses to balance out his teaching load. His workload, by itself, was not a basis for his termination because no post-award criteria had been established; but it is a factor demonstrating that student interest in anthropology was waning. Indeed, since before and after Dr. Walton was awarded a continuing contract, the specter of low student enrollment in anthropology courses in the Lake-Sumter State College system hung over the curriculum. Ongoing low student enrollments in anthropology courses continually required their cancellation, notwithstanding efforts by the College and Dr. Walton to stave off what became inevitable: the discontinuation of anthropology as a discipline for undergraduate exploration.

Both Dr. Walton and the College raise several other points and counterpoints in their legal papers, but in the end the overarching legal question is whether the College had the legal authority to discontinue a

11

discipline, the study of anthropology, based on a lack of student interest and enrollment and whether it adequately documented its decision in the evidentiary proceedings in this case thereby justifying its decision to terminate Dr. Walton, its only anthropology professor, notwithstanding his unblemished performance. We conclude that it did.

AFFIRMED.

LAMBERT, C.J., concurs.
HARRIS, J., concurs in part, and dissents in part, with opinion.

HARRIS, J., concurring, in part, and dissenting, in part.

I am in full agreement with the majority's conclusion that it would have been improper for Lake-Sumter State College to terminate the employment of Dr. Walton based on a determination that his anthropology workload "did not meet [the College's] unilateral, unadopted, and unwritten expectations." However, I would further conclude that the College was not legally justified in terminating Dr. Walton's continuing contract for cause under the facts of this case and would reverse the final order.

Dr. Walton's contract, drafted by and presented to him by the College, sets forth four separate ways in which it could be terminated: by mutual consent, suspension or removal for cause, by written resignation, or because the position has been discontinued. The majority correctly notes that there is no precise definition of "for cause" and then concludes that elimination of Dr. Walton's anthropology courses could constitute good cause sufficient to terminate his contract.

My reading of the contract leads me to the opposite conclusion. By listing discontinuance of Dr. Walton's position as a separate, distinct, and alternative basis for termination, that ground is specifically excluded from whatever "good cause" is ultimately determined to be.

13

While the College certainly has the ability to discontinue anthropology as a discipline for undergraduate exploration, such a determination cannot, under the terms of Dr. Walton's contract, constitute good cause for his termination. The reality is that Dr. Walton's contract was unilaterally terminated by the College's president well before the Board made any decision regarding program discontinuance. None of the contractual grounds for termination existed at the time Dr. Walton was terminated. I would therefore vacate the College's final order and remand with instructions to immediately reinstate Dr. Walton unless and until such time as the College properly terminates his continuing contract of employment.